JENNIE R. SMITH AND COVERT D. BENNETT, PLAINTIFFS
IN ERROR, AND STATE OF NEW JERSEY, DEFENDANT
IN ERROR.

1. If a judgment in a criminal case is reversed on error, in consequence
   of an error committed by the trial judge in charging the jury, the
   first trial will not be a bar to a retrial on the same indictment.
2. The modern English doctrine seems to be that nothing but an existing
   judgment, either of conviction or acquittal, so that a plea of *autre fois
   convict* or *autre fois acquit* can be pleaded, will have that effect.
3. The constitution of this state goes no further than to forbid the retrial
   of a person who has been acquitted.

The plaintiffs in error were tried and convicted of murder
in the first degree. That judgment was reversed in this court
for errors in the charge of the judge to the jury, and a *venire
de novo* directed to be issued.

This was a motion to amend that entry.

Smith and Bennett v. State.

For the motion, *G. Collins* and *James Flemming.*

For the state, *J. P. Stockton, Attorney-General.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The present motion has for its object the amendment of an entry made in the minutes of this court at the last term. The plaintiffs in error having been convicted of the crime of murder in the first degree, before the Court of Oyer and Terminer of the county of Hudson, and having removed that judgment first to the Supreme Court and then to this court by writ of error, and such judgment having been reversed in this court for mistakes in law appearing in bills of exceptions taken to the judge's charge to the jury, and a judgment of reversal having been here entered with an order directing a *venire de novo* to be issued, the application now made is to vacate so much of such order of reversal as prescribes the summoning of a new jury. It is said that the subject embraced in this part of the entry was not considered by this court; that no reference is made to it in the opinion which was read in this cause on the former occasion; and that the order for this new jury process has been, through inadvertence, improperly embraced in the judgment.

The motion is based on a single ground, and that is that these defendants, having been once tried for this offence, cannot be retried for the same cause, on the ground that the fundamental principles of law prohibit the putting of a person twice in jeopardy of his life for the same crimination. It is contended that this is one of the settled rules of the common law, and which has existed so long as to be entitled to take rank among the maxims of our jurisprudence. The first inquiry, consequently, will be whether this contention is well founded in point of fact.

Preliminarily, however, it should be noted that the proposition that a person cannot be twice tried under the same criminal accusation, would take neither form nor place in any

abstract system of morals. · There is nothing inconsistent with the precepts of natural justice in the retrial of a person charged with crime, provided there is reasonable ground to believe that, on the first essay, a just result has not been reached. In such a position of affairs it would be manifestly just that the matter should be re-investigated, as well on the application of society as on that of the party criminated. Where, from a prosecution, either an acquittal or conviction has resulted, and from further examination it is made to appear that such conclusion does not express the truth of the case, the legitimate course would be to correct the error, and to substitute for it such truth. And it seems to me that, in every well-constituted government, this is what is really attempted to be done, unless in those exceptional instances in which the right of retrial would put the defendant too much at the mercy of the government, or would otherwise be oppressive.

And this I understand is what has, in point of fact, taken place in the natural development of the common law. In making this assertion, I rely on precedents and decisions, and not on judicial *dicta* or general expressions. I know of no case in the English courts in which, when a judgment of conviction has been reversed, a retrial has not been ordered, unless when there has been 'an incurable defect in the proceedings. There can be no doubt that cases can be readily instanced in which such a course would not be considered justifiable ; but I am alluding now to the practical working and outcome of the system. As far as my information extends, no convicted felon has been permitted, upon finding a legal flaw in the proceedings, to depart from the dock unpunished on the sole' ground that it would be inconsistent with established rules to jeopard his life a second time. As there have been many reversals in cases of this character, it is manifest, from the result stated, that the rule in question can in no proper sense be said to be a general one. Indeed, so far from such being the case, it appears to me that, in its application to reversed convictions, the so-called rule embraces not the bulk of the

cases but only the exceptions which theoretically have been claimed to exist. Thus, for example, if the indictment be insufficient and the judgment be reversed for that cause, as in *Vaux's case*, 4 *Rep.* 44, there will admittedly be a retrial. So if, on demurrer to a valid indictment, the court by mistake gives judgment in favor of the defendant, a trial may be had after the reversal of such decision, *Reg.* v. *Houston*, 2 *Crawf. & Dix* 310; and the same result follows, if from the misconduct of the jury a verdict is not rendered; or if sickness intervene after the jury is impaneled, or in case the jury are unable to agree, and thus the trial is necessarily brought to a close. In these classes of cases, and others that might be named, it has been thoroughly decided that after such abortive results, the prisoner may be again put upon his trial. I am aware that subtle reasons have been assigned for some of these consequences, but at the present moment I advert only to the actual results that have been reached. If, on the other hand, we look for the cases in which the rule in question has stood in the way of the retrial of a convicted prisoner, the judgment having been reversed, I think as I have said that in the annals of the English law there will be found not a single instance of the kind. There is an Irish case to this effect, but none other that I know of. Undoubtedly there are cases to which such a rule might be applied with some show of reason, and, in my opinion, they would all be embraced in a single class, and that class composed of instances that would but seldom occur. The class to which I refer comprises these cases in which the trial, by the mistake or misconduct of the court, is discontinued, against the wishes of the defendant, after the jury are sworn and before judgment rendered. It is universally admitted, and as appears to me from the most imperative considerations, that if the court, during this interval, should, in spite of the protest of the defendant, discharge the jury, in the absence of any legal necessity for so doing, or should permit, under similar conditions, a *nolle prosequi* to be entered, that such judicial action would be, under any ordinary state of circumstances, unreasonable, and oppressive of the prisoner.

And it will be observed that the rule when restricted within this limit has a manifestly reasonable foundation, for it subserves, by regulating the discretion of the judge, the important purpose of protecting the prisoner from the exercise of a power which, if it existed as a matter of right in the government, could be used most oppressively and to the utter subversion of the right to a speedy and fair trial on the part of defendants. This abuse actually occurred in the case of *Whitebread & Fenwick*, 2 *St. Tr.*, which was for a capital offence, and in which the jury was discharged after the evidence was concluded on the part of the crown, the only reason being that there was not evidence sufficient to convict. This case has seldom been referred to, except for the purpose of being condemned. It affords, however, an appropriate example of the value of the rule that tends to exempt from a repeated jeopardy, when properly applied. Beyond this function of defending prisoners against this narrow class of oppressions I can discover but little benefit in the maxim. It seems to be of no service with respect to the right to plead a former conviction or acquittal, inasmuch as the former judgment, in its own nature, is conclusive of the subject embraced in it, leaving nothing for subsequent adjudication, and is, consequently, a bar, without help of such maxim, to a second prosecution.

With respect to the maxim in the extended form that, upon the argument, was claimed for it, but little authority, in my estimation, is to be discovered in the reported cases. The name of Lord Coke appears to have constituted its principal sanction, and yet, when we examine what he has said upon the subject, it seems evident that his expressions have been exaggerated and misapplied. He refers to the topic twice, the allusion in I *Inst.* 227, *b*, being in these words: "A jury sworn and charged in case of life or member, cannot be discharged by the court or any other, but they ought to give a verdict;" and in the second part of the same work, (2 *Inst.* 110,) is a similar declaration, the language being: "To speak here once for all, if any person be indicted of treason, or of felony, or larceny, and plead not guilty, and thereupon a jury is returned and

sworn, their verdict must be heard, and they cannot be discharged." For these dogmas but a single case from the Year Books, (21 *Edw. III.*, 18,) is cited, and that is certainly but little to the purpose, as the question involved was whether, at a certain stage of the proceedings, the defendant should have the liberty of becoming an approver, and nothing is said with regard to a general rule that a jury once sworn cannot be discharged. I think it quite doubtful whether Lord Coke meant by these expressions anything more than that a jury after being sworn could not, in the exercise of a proper judicial discretion, be discharged at the mere will of the court or of that of the representative of the government. It may, perhaps, be reasonably regarded as a strong protest against the existence of that unbridled discretion in the court to discharge the jury in any stage of the proceedings that had then already been opprobriously displayed in some of the state trials. The expression, "to speak once for all" has more the air of emphatic protestation, than that of an ordinary enunciation of a legal principle. Be this as it may, it is demonstrably clear that Lord Coke could not have intended to assert that all that is embraced within the literal import of his phrases was in his day the settled law, for there were at the time decided cases which were plainly inconsistent with such a view, and of which it is scarcely presumable that so consummate a legal scholar was ignorant. I will, as examples, refer to two cases that occur to me. The one is an anonymous case, cited in *Fost.* 27. It occurred in the reign of Henry VII., and is stated in these words: "It was an indictment for murder, and not guilty pleaded. The jury having heard all the evidence, withdrew to consider of their verdict, and being returned, delivered their verdict into court in writing. And being examined by the court how they came by that writing, confessed that it was delivered into their hands by the prisoner at the bar as they passed by him. The court thereupon discharged the jury of the prisoner, and committed them for this misbehavior. And a new *venire* was awarded." The jury in this case was discharged and the verdict set aside, on the ground

that the defendant was guilty of something like embracery; a result which, perhaps, at the present day, might be sanctioned. The other case to which I allude is that of *Mansell*, 1 *And.* 103, in which, with the consent of the defendant, the jury was discharged after the evidence was closed on both sides. And in addition to these cases which had been adjudged anteriorly to the pending of these passages of the Institutes, nothing is more certain than that the law at the time was not in such a condition as to make it practicable to formulate any general rule from the adjudications upon this subject. Any one who will search will find that there was nothing settled with respect to this matter at the time when the Institutes were composed, or for a long time afterwards. When Lord Coke died, Sir Matthew Hale had attained his majority, and we have but to glance at the treatise of the latter on the criminal law to be convinced of the truth of this observation. For example, after noticing the doctrine in the passages cited from Lord Coke, he says, 2 *P. C.* 295 : " But yet the contrary course hath for a long time obtained at Newgate, and nothing is more ordinary than after the jury sworn, and charged with a prisoner, and evidence given, yet if it appear to the court that some of the evidence is kept back, or taken off, or that there may be a fuller discovery, and the offence notorious as murder or burglarly, and that the evidence though not sufficient to convict the prisoner, yet gives the court a great and strong suspicion of guilt, the court may discharge the jury of the prisoner, and remit him to the gaol for further evidence; and accordingly it hath prevailed in most circuits of England, for otherwise many notorious murders or burglaries may pass unpunished by the acquittal of a person probably guilty, where the full evidence is not searched out, or given " A number of instances are then given in which, at the discretion of the court, juries were discharged in capital cases, after they had been sworn. These citations are not intended for the purposes of showing that the judicial power which was thus exercised is to be justified; but as authentic witnesses of the truly unsettled and plastic state of the practice in regard to

this matter during the long period covered by the life of Lord Hale. The following cases bear testimony to the same condition of things. *Rex* v. *Jane D——*, 1 *Vent.* 69 ; *Keil.* 46, 52 ; *Rex* v. *Segar*, *Comb.* 401 ; *T. Raym.* 84.

Nor, in this place, should the authority of the Doctor and Student, be pretermitted, for the work has the commendation of Lord Coke himself, for he says, using his own language, " the author's name was St. Germain, a discreet man and well read." I will refer to the following passage of that well-known work, *Doc. and Stu.*, *c.* 52 : " And if the jury will in no wise agree, I think that the justices may set such order in the matter as may seem to them, by *their discretion*, to stand upon reason and conscience, by awarding of a new inquest, and by setting a fine upon them that they shall find in default, or otherwise, as they shall think best by their discretion ; like as they may do if one of the jury die before verdict, or if any other like casualties fall in that behalf." And here again it is plain the doctrine is stated in a way that is repugnant to the generality of Lord Coke's rule, which denies the right to discharge the jury in any case whatever after they have been called to the book.

The case of *Rex* v. *Keite*, 1 *Ld. Raym.* 138, should also be particularly noticed, for it indicates to us what Lord Holt thought, in a measure, on this subject. There were two indictments—one for murder and the other for stabbing under the statute—and there were two special verdicts, and the difficulty was to deduce, from the facts stated, by legal rules, the character of the crime. No conclusion was arrived at with respect to this point by the court, but Lord Holt suggested defects in the indictments, and the indictment founded on the stabbing was quashed ; and, after noticing certain imperfections in the other indictment, the report says, referring to the Chief Justice, " He did not say absolutely that these exceptions to the indictment of murder are fatal ; but he said that if the king's counsel did not insist to demand their judgment upon the verdict, he should make no scruple to quash it. And the king's counsel not opposing it, both the indictments were

quashed." The defendant was bailed, to be tried at the next
Assizes, where he was found guilty of manslaughter. Here,
the defendant having been once tried, could not, according to
the so-called general rule, be again put in jeopardy for the
same offence, and yet Lord Holt did not hesitate to quash the
indictment, with the assent of the counsel of the crown, al-
though he " did not say absolutely " that the exceptions to the
indictment were fatal. The facts had been found against the
prisoner, and he was consequently in danger of his life, and
there is no reason to suppose that the thought so much as
entered the mind of this most enlightened and experienced
judge that, by making this decision in favor of the prisoner,
he could claim to take advantage of it in the way of a bar to
a second prosecution.

And, indeed, for a century after the time of Lord Coke the
common law undoubtedly continued in this unsettled condition
upon this point, for the question of the power of the court to
discharge a jury from the box in a capital case was directly
raised and discussed as an open question in the important case
of the *Kinlochs*, *Fost.* 22. This trial grew out of the rebellion,
and occurred towards the close of the year 1746. The legal
question which was presented to the attention of the court
arose out of this state of facts: When these defendants were
first arraigned, and a jury sworn, and the case opened by the
solicitor-general on the side of the government, it was sug-
gested that the counsel of the defendants wished to interpose
certain objections, and which, upon being disclosed, appeared
to amount to a plea to the jurisdiction, and which, therefore,
could not legally be made available at so late a stage of the
procedure. There were certain equitable considerations which
finally induced the court, at the request of the prisoners, and
with the assent of the attorney-general, to permit a juror to
be discharged. This being done, a plea to the jurisdiction,
founded on the matter just referred to, was put in, and being
overruled by the court a new jury was impaneled, and the
defendants convicted; and being brought to the bar to receive
judgment, their counsel moved for an arrest of judgment, on

the ground that their second trial was a mistrial, inasmuch as the first jury had been discharged after having been sworn. To sustain this position, the before-cited authority of Lord Coke was principally relied on. The question thus raised was fully argued and carefully considered, the result being the overruling of the motion, and the prisoners were accordingly sentenced and executed. In an admirable opinion, replete with learning and good sense, Judge Foster refutes the idea that there is any inflexible general rule governing the practice in respect to the matter. In the course of his remarks he says that " it seems that an opinion did once prevail that a jury once sworn and charged in any criminal case whatsoever could not be discharged without giving a verdict, but this opinion is exploded in *Ferrar's case, Raym.* 84; and it is there called a *common tradition,* which had been held by many learned in the law." And again he says, referring to a line of cases cited by him, " but still they show that the rule now contended for on the part of the prisoners cannot be true in the latitude the words import. And I think they do in part show, what I hinted in the beginning, that no general rule can govern the discretion of the court on this question in all possible cases and circumstances." He then cites, with approbation, these sentences from Lord Hale: " In case a man in a phrenzy happen, by some oversight, to plead to his indictment and put himself on his trial, and it appeareth to the court on his trial that he is mad, the judge, in discretion, may discharge the jury of him, and remit him to gaol, to be tried after the recovery of his understanding." And he concludes that the judgment in the case before him ought not to be arrested, as " the discharging of the jury in this case was not a strain in favor of prerogative—it was not done to the prejudice of the prisoners; on the contrary, it was intended as a favor to them."

This case, which I consider a leading one, has never been reversed, and it serves two purposes—first, it entirely explodes the notion that after the prisoner has been once put in jeopardy by the legal impaneling of a jury he cannot for the same

matter be again put upon his trial before a second jury; and, second, its tendency strongly is to favor the conversion of the rule into an emphatic caution against a discharge of the jury after they have been sworn, without the consent of the prisoner, and in the absence of any overruling necessity.

That there is a power in the judiciary to discharge a jury in criminal cases, after having been impaneled and sworn, and to retry the prisoner after an illegal verdict of conviction, under certain circumstances, will also appear by a reference to the following cases: *Rex* v. *Hayes*, 2 *Ld. Raym.* 1521; *King* v. *Scalbert*, 2 *Leach's Cas.* 706; *King* v. *Stevenson*, 2 *Leach's Cas.* 618; *Elizabeth Meadow's case, Fost.* 76.

Passing by some slight indications scattered here and there through the reports, showing the persistence of this uncertainty and judicial vacillation as to the existence of any course of practice that could be called a rule upon the subject, if we come to the time of Sir William Blackstone we find the same unfixed condition of things. This appears in the very terms used by the commentator in his attempted definition of a rule. These are his words: "When the evidence is closed on both sides, and indeed where any evidence has been given, the jury cannot be discharged (unless in case of evident necessity) until they have given in their verdict." This rule differs from Lord Coke's in respect to the elastic qualification contained in it, and in the feature that it is applicable alike to crimes of all grades. Moreover, it will be observed that the practical efficacy of the rule is left entirely dependent on the construction that may be put upon the clause relating to the class of cases to be excepted out of the rule. What are cases of evident necessity, and who shall be the arbiter on the subject, have been the disputed questions from the beginning. In the case of *Whitebread & Fenwick*, already cited from *St. Tr.*, in which the jury was discharged because the government had failed to make its case good, the judges doubtless thought that there existed a case of evident necessity for their action. It is clear that the matter was not subjected to anything like a

determinate regulation by the definition of the great commentator.

My examination of the cases up to this period when they cease to be of peremptory authority in this state, has convinced me that there was no general rule upon the subject in question that was considered inflexible or inviolable by the courts; but that as successive exigencies occurred, and it became necessary to reverse judgments or discharge juries in criminal proceedings, such results were invariably attended by an order for a *venire de novo*, unless the error occasioning the reversal was of a fundamental nature, in which event the prisoner was consigned to bail or to prison to await a retrial on a new indictment. As I have already remarked, there appears to be no recorded instance of a trial that had been rendered abortive by reason of the discharge by the court of a duly impaneled jury, or of an imperfect verdict, or by reversal for error apparent on the record, being held equivalent to a legal acquittal or conviction, so as to stand as a bar to a further prosecution.

Nevertheless, during this whole period of time there certainly appear clear traces in the books of an impression prevailing quite generally, that cases might occur in which the action of the court in bringing the trial to a premature close after the jury had been sworn, might constitute error in law and be tantamount, in legal effect, to a verdict in favor of the defence. Such an idea is expressed in the rule enunciated by Blackstone, unless we regard such rule as a declaration of judicial duty in the exercise of that discretion which in most respects is admittedly lodged in the court, over the conduct of the trial. And indeed this is the very interpretation put upon it by certain recent cases in the English courts, and which appear to me to be altogether conclusive upon the point, taking into account the thoroughness of the discussions on these occasions and the eminence of the persons who participated in the decisions.

The first of the cases to which I thus allude, arose in the Irish courts, and is that of *Conway and Lynch* v. *Queen*, 7 *Irish*

Smith and Bennett v. State.

*L. R.* 149. It was an indictment for a capital offence, and the jury had been discharged by the court, on the ground that they were not able to agree upon a verdict. At a subsequent Assizes, when the prisoners were again placed at the bar for trial upon the issues so previously joined, they interposed a special plea, in the nature of a plea *puis darrien continuance*, setting forth their former arraignment and the proceedings at the trial, and then averring the discharge of such jury by the court, with negations that such action was at the request of the defendants or in consequence of sickness, or the misconduct of the jury, or for any other legal or sufficient cause whatsoever. To this plea the crown replied, showing in substance that the jury were sent to their private room to deliberate on their verdict, and that they remained there "without meat, drink or fire or other refreshment" for the space of twenty-four hours, and that they then returned into court, and there in the presence of the defendants declared that they had not agreed, and could not agree together on any verdict; and that thereupon, in the exercise of their discretionary power and authority, the said jurors were discharged. This replication was demurred to, and upon joinder the issue was found for the crown ; and thereupon the prisoners were tried, convicted and sentenced to death. This record having been removed from the Assize Court to the Queen's Bench in Ireland, the judgment which had been rendered was reversed and the prisoners were discharged. This decision proceeded on the ground that the Assize Court had no discretion to discharge the jury unless in a case of evident necessity ; that if such necessity existed, an entry of the facts establishing such necessity should have been made on the record ; and that the Queen's Bench, sitting as a court of errors had a right to review the act of the court in discharging the jury. But this conclusion was not the unanimous opinion of the judges, but was reached in the face of a memorable protest in the dissenting opinion of Mr. Justice Crampton. I say memorable protest, because the dissenting opinion referred to has virtually been adopted by the judges of the Court of the King's Bench in England in a

case presently to be noticed, and because the opinion itself is such a masterpiece of logical reasoning and well-digested learning. The result to which this opinion leads is this: that the question when and under what circumstances a jury in the progress of a criminal case shall be discharged, is one which is left entirely to the judge presiding at the trial, and that " the evident urgency of the case in the advancement of impartial justice, and the necessary and indulgent protection of the prisoner, are the circumstances by which the discretion of the judge should be guided ;" and that error cannot be predicated of such an exercise of discretion and consequently such instances of judicial conduct are not reviewable. "But the true and rational doctrine is," such is the language used, " that where a trial proves abortive in consequence of no legal verdict being given, a *venire de novo* ought to go, whether the result has flowed from the error of the judge, or the jury, or of both." The opinion further maintains, by much force of argument and authority, that the principle which forbids the putting of the prisoner twice in jeopardy does not apply to any case except such as have resulted in a lawful acquittal or conviction. "To make such a case," says the learned judge, " the prisoner must show that he was ' *legitimo modo acquietatus vel convictus*,' that is, by due course of law."

And these are the judicial declarations of the law which in the year 1866 were deliberately sanctioned by the Court of the Queen's Bench in England in the case of *Winsor* v. *Queen, L. R.,* 1 *Q. B.* 289. This was also a case in which a jury failing to agree had been discharged by the court, and it was resolved, after a very full examination of the precedents, that the judge had a discretion in a criminal case to discharge a jury, which a court of error could not review; that the discharge of the first jury without a verdict was not equivalent to an acquittal, and that a second jury process might issue. Upon this subject Cockburn, Chief Justice, expresses himself with his usual vigor and perspicuity ; he says, speaking of the judicial power in question, " it appears to me that if the true principle on which justice ought to be administered is regarded,

it is essential in trial by jury not to abridge the judge's discre-
tion, but to leave it unfettered." With respect to the case of
Conway and Lynch *v.* Reg., which has just been commented
on, he remarks, "that the judgment of Crampton, who dis-
sented from the decision of the other judges, carried to my
mind perfect conviction;" and with respect to the right that
was claimed to assign error, on the exercise of such discretion
at the trial, he entirely disclaims such a power, and says, "it is a
fallacy, as it seems to me, to say that 'necessity' here is a ques-
tion of law;" and he adds, "therefore I say, in the first place,
that there was a discretionary authority, that the judge had
power to exercise it; and I say secondly, whether it was prop-
erly exercised or not, it is not a matter that could be brought
before a court of error upon the record." With respect to a
duplication of jeopardy, the Chief Justice holds the same
views as those expressed by Judge Crampton and which have
already been cited. In this same case Mr. Justice Blackburn
delivered an opinion agreeing to the observations of the Chief
Justice, and said that the statements of the law by Crampton
in his "admirable judgment," he was convinced were correct;
that "when the jury have been brought together, the prisoner
has been given in charge, and the trial has commenced, there
is no doubt that the right course, if practicable, and the course
that ought to be adopted, unless there is some reason to the
contrary, is, that the jury should proceed to give their verdict,
acquitting or convicting the prisoner;" and he thus expresses
his conclusion, "that where there has not been a verdict de-
cisive of the guilt or innocence of the prisoner, and the indict-
ment has not been disposed of, whether it be owing to the
mistake of the judge, the fault of the jury, inevitable acci-
dent, or the improper discharge of the jury, in all these cases
indifferently a *venire de novo* ought to be awarded." Likewise
he maintains that this exercise of discretion on the part of
the trial judge cannot be reviewed on error.

It will be observed, therefore, that if this authoritative
judgment is to be accepted as the final exposition of the law
upon this subject by the English courts, the result reached is

that nothing but the existence upon the record of a judgment of acquittal or conviction will be a bar against a retrial for the same offence. A reversed judgment is utterly inefficacious for such a purpose, and the judge's action in discharging the jury in any stage of the proceedings cannot, on any subsequent occasion, be even drawn in question any more than can the exercise of his discretion in postponing or ordering on the trial.

Touching the judicial views entertained upon this topic by the various courts in this country, it appears to me enough for my present purpose to remark that, although on some important matters in this field they are not consistent, yet I think they, in the main, support the ultimate conclusions to which the English judges have come, except, perhaps, in the one respect of considering every act done by the judge presiding at the trial in discharging the jury a matter of discretion, and not reviewable under any circumstances. In the case of *Barrett and Ward* v. *People*, 2 *Caines' R.* 304, it was directly held that when the public prosecutor, after the jury had been sworn and evidence offered, with the assent of the court and without the prisoner's consent, withdrew a juror, merely because he was unprepared with his evidence, the prisoner could not afterwards be tried on the same indictment. And this view seems to be that taken by several of the courts and text writers in this country, such an ending of the prosecution being generally regarded as equivalent to an acquittal of the prisoner. But this doctrine, in my judgment, might, on occasions readily to be imagined, lead unnecessarily to the frustration of justice in criminal prosecutions, and whether it would be sanctioned in this state is not certain; but at present it will suffice to say that it is not now in question, and that no opinion on the point is intended to be expressed. With regard to the right of the court to discharge the jury when necessity exists, the American decisions appear to be uniform in favor of the power; and it was so adjudged in this state over half a century ago, in the case of *State* v. *Hall*, 4 *Halst.* 319. On the other points, for the most part,

the English and American cases are in harmony, and this, too, although in this country the subject has, to some extent, been affected by the circumstance that the common law rule has been embodied, in the form of an express provision, in the national constitution, and in those of several of the states. But notwithstanding this new element, I have not found that when a judgment of conviction has been reversed by the action of the prisoner, that such judgment has operated as an acquittal, and that the government has consequently been debarred from a further prosecution for the same offence. In the year 1830 it was held by the Supreme Court of this state, in the case of *State* v. *Jones*, 6 *Halst.* 290, that where a defendant had been acquitted on the ground of a variance between the allegation of the indictment and the proof, such acquittal would not be a bar to another indictment correctly drawn.

Let us now turn to the case before us, and look at it in the light reflected upon it by the principles thus judicially vindicated and adopted.

The judgment in the present case was reversed, not on account of any error inherent in the record, but for the reason that certain errors supervened in the charge of the judge at the trial in giving the case to the jury. It has been repeatedly held that when a judgment of this kind has been reversed on the ground of error manifested in the recorded proceedings, a *venire de novo* will be ordered. For example, when the judgment against the prisoner is annulled from the radical imperfection of the indictment, as in *Vaux's case*, 4 *Rep.* 44; or in case the verdict is so incomplete that a judgment cannot be entered upon it, as in *Reg.* v. *Woodfall*, 5 *Burr.* 2661; *Rex* v. *Wages*, 2 *Ld. Raym.* 1518; or where the jury process has been misawarded, *Arundel's case*, 6 *Rep.* 14, *a;* or the jury process was erroneous in summoning the jury to try one crime when two were charged in the indictment, *Campbell* v. *Queen*, 11 *Ad. & El.* (*N. S.*) 835; or where a right of challenge to the jury was wrongly overruled, *Gray* v. *Queen*, 11 *Cl. & Fin.* 490. There are a number of

American cases to the same purpose. In all these instances the defendants were a second time put upon their trial. In some of them the reason given is that the defendant was not, in a legal sense, put in jeopardy by the first illegal procedure. Granting this to be the test of a legal right to retry the party who has been already once arraigned, it seems apparent that the present case will not fall below that standard. Formerly, and at common law, the legal errors occurring at the trial, unless they were of a nature to be displayed by the record, could not be set up against the judgment; but now, by the statute of this state giving bills of exceptions in this class of cases, this may be done, and no reasonable ground is perceived why reversals proceeding from legal imperfections manifested by bills of exceptions should not have the same effect as reversals occasioned by imperfections manifested by the record. The reason why judgments embraced in either of these two classes are pronounced to be invalid, is, that error in matter of law has supervened in the course of the trial, and the judgments on that account are nullities when avoided; and as no judgment, with such a defect inhering in the procedure, could be in any degree efficacious, the prisoner cannot be said to have been jeoparded by it. To make a discrimination between the judge's erroneous ruling with respect to a challenge to the juror last sworn, and an objection interposed to the swearing of the first witness, so that, in the first case, the judgment will be reversed and the defendant retried, and that, in the second case, upon a reversal, the defendant will be as fully discharged from further prosecution as though he had been acquitted upon the merits, would be obviously inconsistent with right reason. I see no possible pretext for such a distinction, and it is not to be supposed that the legislature intended, by authorizing these bills of exceptions, to introduce a practice that would be consequent on such a distinction. No one can believe that it was the statutory design, that if the prisoner, after conviction, could show that the judge involuntarily fell into error in any part of the trial, the consequence was to be that he was to be entirely absolved

of his crime, so far as human justice was concerned. It has already been said, and endeavored to be shown, that the rule forbidding, in criminal cases, a repetition of the prisoner's jeopardy, was intended to be his shield against the persecution or molestation of the government; and to apply, therefore, a rule having such a purpose to an instance where the prisoner has suffered from an unintentional mistake of the judge presiding at his trial, would be altogether irrational. The government does not warrant to him the infallibility of its judges any more than it insures his own health or the health of the jurors to whom he is given in charge, and therefore he cannot complain that his trial has proved abortive by reason of the accident of the former falling into error, or the accident of the latter falling into illness. The judicial liability to err is a natural and inseparable part of the proceeding; it is a defect in the nature of the transaction, and therefore cannot be eliminated, and is more detrimental to the government than to the accused, because if the error is adverse to the former, leading to an acquittal, the default is irremediable, but this is not so when the defendant is prejudiced, as he can have the judgment annulled.

This result, arrived at on the foundation of the general principles of the common law, is much fortified when we come to a consideration of the provision touching this subject, contained in the constitution of this state. That provision is unlike the cognate regulation contained in the national constitution, or in those of the several states, in the circumstance that it embraces a much narrower field. It is section ten of article one that relates to this subject, and it is in these words, viz., "No person shall, after acquittal, be tried for the same offence." The expression of immunity in this particular class of cases would seem to give rise to the implication of the exclusion of immunity in all other classes.

A second trial is not interdicted when the first trial has proved abortive by reason of the mistake or misconduct of the judge or jury, or from accident, but only in the one case where the trial has resulted in an acquittal. By the bare

force of this phraseology, it may be, that without other helps the law of this state would be placed very nearly in unison with the rule of the common law on this subject, as such rule has been generally construed in the decisions already cited. What interpretation the term " acquittal," as here used, is to have, whether it is to denote that the defendant has been *acquietatus legitimo modo,* or has been acquitted in point of fact, irrespective of circumstance or mode in point of law, is a question not now to be considered, for it does not, in the most distant degree, arise, as in the present case there was a conviction. It is sufficient in this case to say that the defendants are not within the class to whom an immunity from a second trial is given by this clause of the constitution.

With regard to the form of the entry of the present judgment on the minutes of this court, it was suggested that it was erroneous, as it contained a direction that a *venire de novo* should be issued out of the Oyer and Terminer. But this direction is proper, as it truly indicates to the subordinate court the purpose and judgment of this court. It appears to be in accordance with the English practice. A similar entry will be found in the case of *Campbell* v. *Queen,* 11 *Ad. & El.* (*N. S.*) 813, and in *Gray* v. *Queen, supra.*

Let the motion be denied.